IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:11-CV-2-D

| | | |
|---|---|---|
| MARK AUGUSTSON, | ) | |
| ROBERT S. KIEL, | ) | |
| JEANNE B. KIEL, and | ) | |
| JOSEPH PROSSER, | ) | |
| | ) | |
| Plaintiffs, | ) | **ORDER** |
| | ) | |
| v. | ) | |
| | ) | |
| BANK OF AMERICA, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

On January 4, 2011, Mark Augustson ("Augustson"), and Robert S. Kiel and Jeanne B. Kiel ("Kiels") (collectively, "plaintiffs") sued Bank of America, N.A. ("Bank of America" or "defendant") on behalf of themselves and a class of similarly situated individuals. Compl. [D.E. 1].[1] On January 6, 2011, plaintiffs refiled their complaint with properly attached exhibits [D.E. 5]. On January 25, 2011, plaintiffs filed an amended complaint, adding Joseph Prosser ("Prosser") as a named plaintiff. Am. Compl. On March 4, 2011, Bank of America moved to dismiss plaintiffs' amended complaint for failure to state a claim upon which relief can be granted, and filed a supporting memorandum [D.E. 23, 24]. On April 4, 2011, plaintiffs filed a memorandum in opposition to Bank of America's motion to dismiss. Pls.' Mem. Opp'n Mot. Dism. [D.E. 28]. On April 19, 2011, Bank of America replied [D.E. 30]. As explained below, the court grants in part and

---

[1] Although plaintiffs' complaint and amended complaint allege that plaintiffs bring their claims on behalf of themselves and a class, plaintiffs have not yet sought class certification and all facts in their amended complaint concern the named plaintiffs' mortgages. See Compl. ¶ 3; Am. Compl. [D.E. 13] ¶ 3.

denies in part Bank of America's motion to dismiss.

I.

Plaintiffs' claims relate to the No Fee Mortgage Plus Loans ("NFMP loans") that plaintiffs each received from Bank of America. See Am. Compl. ¶¶ 1–3. Bank of America began offering NFMP loans in approximately May 2007. Id. ¶ 10. In marketing these loans, Bank of America offered to "waive or pay all fees for services or products required by the Bank in order to provide a fixed mortgage to qualifying borrowers . . . ." Id.; Pls.' Mem. Opp'n Mot. Dism. 8. Many home mortgage lenders, including Bank of America, "typically require[] a borrower to pay [for] private mortgage insurance when a home's loan-to-value ratio is greater than eighty percent of the collateral property's fair market value." Am. Compl. ¶ 12; see also Pls.' Mem. Opp'n Mot. Dism. 8. Private mortgage insurance generally can be obtained in two ways: a borrower may pay an insurance premium directly to a mortgage insurer or a borrower may pay an insurance premium to the lender, with the lender then purchasing insurance on the borrower's behalf. Am. Compl. ¶ 13; Pls.' Mem. Opp'n Mot. Dism. 8. When a borrower obtains private mortgage insurance through a lender, "the lender usually pays a single premium at or after loan closing, and then passes that cost to the borrower by charging the borrower a higher interest rate." Am. Compl. ¶ 15.

When offering NFMP loans, Bank of America promised to waive or pay the fees that it would ordinarily charge for private mortgage insurance. Id. ¶ 11. Plaintiffs allege that in 2007, a Bank of America official publicly stated that the "NFMP loans did not include any private mortgage insurance because of the Bank's vast reserves," which allowed Bank of America to self-insure. Id. ¶ 17.

In 2007 and 2008, each of the named plaintiffs applied for and received NFMP loans from

2

Bank of America. Id. ¶¶ 19–29, 44–52, 67–73; Pls.' Mem. Opp'n Mot. Dism. 9.[2] When Bank of America approved these loans, it informed plaintiffs that it would "waive or pay all fees for services or products required by Bank of America in order to grant credit to [plaintiffs] for the purchase of a primary residence." Am. Compl. ¶¶ 22, 46, 69 (quotations omitted); id. Exs. B, G; Pls.' Mem. Opp'n Mot. Dism. 9 (quotation omitted). Before the loans closed, Bank of America told Augustson and the Kiels that there was no private mortgage insurance on their loans. Am. Compl. ¶¶ 24–25, 50–51.

Plaintiffs allege that despite Bank of America's pre-closing assertions, "at closing, and without each [p]laintiffs' [sic] knowledge or permission, Bank of America purchased [private mortgage insurance] policies on their respective homes." Pls.' Mem. Opp'n Mot. Dism. 9; see Am. Compl. ¶¶ 31, 34–35, 54, 57–58, 74, 77–78. According to plaintiffs, upon information and belief, the interest rates that Bank of America charged on their loans subsidized Bank of America's purchase of private mortgage insurance. See Am. Compl. ¶¶ 32, 55, 75; Pls.' Mem. Opp'n Mot. Dism. 9–10.

In 2010, while attempting to refinance his or her loan through Bank of America, each plaintiff learned that Bank of America had purchased private mortgage insurance on his or her loan. See Am. Compl. ¶¶ 37–38, 60–61, 80–87 & Exs. O, P, Q; Pls.' Mem. Opp'n Mot. Dism. 10.[3] Bank of

---

[2] Augustson closed his loan on March 14, 2008, agreeing to pay a principal amount of $202,500 at a fixed annual percentage rate of 6.5 percent over a thirty-year term. Am. Compl. ¶ 29. The Kiels closed their loan on August 29, 2008, agreeing to pay a principal amount of $112,500 at a fixed annual percentage rate of 6.875 percent over a thirty-year term. Id. ¶ 52 & Ex. K. Prosser closed his loan on May 16, 2008, agreeing to pay a principal amount of $132,050 at a fixed annual percentage rate of 6.375 percent over a thirty-year term. Id. ¶ 73.

[3] Each plaintiff sought to refinance his or her loan under the Home Affordable Refinance Program ("HARP"). Am. Compl. ¶¶ 37, 60, 80. HARP is a recently created government program that allows a borrower whose loan is owned or guaranteed by Fannie Mae or Freddie Mac to attain "a new, more affordable, more stable mortgage" through the borrower's original servicer. "Home

3

America informed each plaintiff that he or she was not eligible for refinancing because Bank of America had purchased private mortgage insurance on each plaintiff's loan. Am. Compl. ¶¶ 39, 60, 87–88; Pls.' Mem. Opp'n Mot. Dism. 10. Plaintiffs then asked Bank of America to cancel the mortgage insurance policies on plaintiffs' loans and to refinance plaintiffs' loans at rates commensurate with existing market conditions, but Bank of America refused. Am. Compl. ¶¶ 42, 64–65, 91–92.

In their amended complaint, plaintiffs assert four claims. First, they allege that Bank of America violated the Homeowners Protection Act of 1998 ("HPA"), 12 U.S.C. §§ 4901–4910. Am. Compl. ¶¶ 104–10. In support, plaintiffs cite Bank of America's failure to inform them that it purchased private mortgage insurance, and allege that Bank of America thereby violated section 4905 of the HPA. Id. ¶¶ 106–08; see also 12 U.S.C. §§ 4905, 4907(a). Second, plaintiffs allege that Bank of America committed fraud under North Carolina law. Am. Compl. ¶¶ 111–19. Third, plaintiffs allege that, in the alternative to fraud, Bank of America committed negligent misrepresentation under North Carolina law. Id. ¶¶ 120–25. Fourth, plaintiffs allege that Bank of America is liable for unjust enrichment under North Carolina law. Id. ¶¶ 126–29. Finally, plaintiffs seek damages and an injunction ordering Bank of America "to cancel any [private mortgage insurance] that it has placed on the properties of the [p]laintiff[s] . . . ." Id. ¶¶ 130–33 & Prayer for Relief.

Bank of America moves to dismiss plaintiffs' amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. See Def.'s Mot. Dism. [D.E. 23]. Bank of America argues

---

Affordable Refinance Program (HARP)," MakingHomeAffordable.gov, available at http://www. makinghomeaffordable.gov/programs/lower-rates/Pages/harp.aspx (last visited Mar. 28, 2012). Plaintiffs assert that, but for their loans being subject to private mortgage insurance, they would have been eligible for HARP. Am. Compl. ¶¶ 40, 63, 89.

that plaintiffs' HPA claim fails because the HPA mandates that a lender disclose to a borrower its purchase of private mortgage insurance only when such purchase "is required in connection with a residential mortgage transaction." Def.'s Mem. Supp. Mot. Dism. [D.E. 24] 5 (emphasis and quotation omitted). Bank of America contends that private mortgage insurance was not "required in connection with" any of plaintiffs' mortgage loans. Id. 7. Thus, Bank of America argues that plaintiffs' HPA claim fails. As for plaintiffs' fraud and negligent misrepresentation claims, Bank of America argues that the HPA preempts these state-law claims and, alternatively, that plaintiffs have failed to plausibly allege fraud or negligent misrepresentation. Id. 8–11, 15–24. As for plaintiffs' unjust enrichment claim, Bank of America argues that plaintiffs have failed to plausibly allege unjust enrichment. Id. 24–26. Finally, Bank of America seeks dismissal of plaintiffs' request for an injunction, arguing that an injunction is a remedy rather than a stand-alone cause of action, and that injunctive relief is inappropriate in this case. Id. 26–28.

## II.

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must determine whether the complaint is legally and factually sufficient. See Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949–50 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007); Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, No. 10-1016, 2012 WL 912951 (U.S. Mar. 20, 2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008); Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (en banc); accord Erickson v. Pardus, 551 U.S. 89, 93–94 (2007) (per curiam). Although a court "assume[s] the facts alleged in the complaint are true and draw[s] all reasonable factual inferences in [plaintiff's] favor," Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 406 (4th Cir. 2002), a court need not accept a complaint's legal conclusions drawn from the facts. See Iqbal, 129 S. Ct. at 1949–50. Similarly,

5

a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments."

Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 129 S. Ct. at 1949–50.

A.

Section 4905 of the HPA states that in any case in which "lender paid mortgage insurance

. . . is required in connection with a residential mortgage transaction," the mortgagee must provide

written notice to the mortgagor of certain facts pertaining to lender-paid private mortgage insurance.

See 12 U.S.C. § 4905.[4] Specifically, the mortgagee must inform the mortgagor, "not later than the

---

[4] 12 U.S.C. § 4905(c) states,

In the case of lender paid mortgage insurance that is required in connection with a residential mortgage transaction—

(1) not later than the date on which a loan commitment is made for the residential mortgage transaction, the prospective mortgagee shall provide to the prospective mortgagor a written notice—

(A) that lender paid mortgage insurance differs from borrower paid mortgage insurance, in that lender paid mortgage insurance may not be canceled by the mortgagor, while borrower paid mortgage insurance could be cancelable by the mortgagor in accordance with section 4902(a) of this title, and could automatically terminate on the termination date in accordance with section 4902(b) of this title;

(B) that lender paid mortgage insurance—

(i) usually results in a residential mortgage having a higher interest rate than it would in the case of borrower paid mortgage insurance; and

(ii) terminates only when the residential mortgage is refinanced (under the meaning given such term in the regulations issued by the Board of Governors of the Federal Reserve System to carry out the Truth in Lending Act (15 U.S.C. 1601 et seq.)), paid off, or otherwise terminated; and

(C) that lender paid mortgage insurance and borrower paid mortgage insurance both have benefits and disadvantages, including a generic analysis of the differing costs and benefits of a residential mortgage in the case [of] lender paid mortgage insurance versus borrower paid mortgage insurance over a 10-year period, assuming prevailing interest and property appreciation rates;

(D) that lender paid mortgage insurance may be tax-deductible for purposes of Federal income taxes, if the mortgagor itemizes expenses for that purpose; and

6

date on which [the] loan commitment is made," that the mortgagor cannot cancel the lender-paid private mortgage insurance and that the insurance will terminate only if the mortgage is refinanced. Id. § 4905(c)(1). Additionally, when lender-paid mortgage insurance "is required in connection with a residential mortgage transaction," section 4905 requires a mortgagee to inform a mortgagor of the differences between lender-paid mortgage insurance and borrower-paid mortgage insurance. Id. The HPA defines "borrower paid mortgage insurance" as "private mortgage insurance that is required in connection with a residential mortgage transaction, payments for which are made by the borrower . . . ." Id. § 4905(a)(1). The HPA defines "lender paid mortgage insurance" as "private mortgage insurance that is required in connection with a residential mortgage transaction, payments for which are made by a person other than the borrower . . . ." Id. § 4905(a)(2). The HPA defines "loan commitment" to mean "a prospective mortgagee's written confirmation of its approval, including any applicable closing conditions, of the application of a prospective mortgagor for a residential mortgage loan." Id. § 4905(a)(3).

Plaintiffs allege that Bank of America "required" lender-paid mortgage insurance "in connection with" their "residential mortgage transaction[s]" and violated the HPA when it failed to make the HPA disclosures under section 4905(c). Pls.' Mem. Opp'n Mot. Dism. 12 (quotations omitted); see id. 13 n.2 (citing Am. Compl. ¶¶ 12, 23, 47, 70). Bank of America responds that private mortgage insurance was not "required" in connection with plaintiffs' residential mortgage

---

(2) not later than 30 days after the termination date that would apply in the case of borrower paid mortgage insurance, the servicer shall provide to the mortgagor a written notice indicating that the mortgagor may wish to review financing options that could eliminate the requirement for private mortgage insurance in connection with the residential mortgage transaction.

12 U.S.C. § 4905(c).

transactions. See 12 U.S.C. § 4905(c). Rather, Bank of America simply decided to voluntarily purchase and pay for private mortgage insurance. As such, Bank of America contends that section 4905(c) does not apply. Plaintiffs reply that allowing a lender to forego disclosure when the lender voluntarily purchases and pays for private mortgage insurance before or after a loan's origination and then fails to disclose the insurance purchase to the borrower would permit "an end-run around the HPA that would frustrate Congress'[s] intent in enacting the statute." Pls.' Mem. Opp'n Mot. Dism. 13–14.

The dispute in count one focuses on the term "required" in section 4905(c). Congress did not define the term "required," but did use the word again in defining "lender paid mortgage insurance." See 12 U.S.C. § 4905(a)(2). Moreover, Congress made clear in the HPA that "[n]othing in this chapter shall be construed to impose any requirement for private mortgage insurance in connection with a residential mortgage transaction." Id. § 4910(a). Thus, the HPA does not "require" private mortgage insurance (whether borrower paid or lender paid).

In analyzing the term "required" in section 4905(c) and the phrase "required in connection with a residential mortgage transaction" in sections 4905(a)(2) and 4905(c), the court initially seeks to give the statutory language its "plain and unambiguous meaning . . . ." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997); see, e.g., Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–54 (1992); McLean v. United States, 566 F.3d 391, 396 (4th Cir. 2009); United States v. Thompson-Riviere, 561 F.3d 345, 354 (4th Cir. 2009); Ayes v. U.S. Dep't of Veterans Affairs, 473 F.3d 104, 108 (4th Cir. 2006). In doing so, the court "must first determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute . . . and [the] inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." Ignacio v. United States, No. 10-2149, 2012 WL 887594, at *2 (4th Cir. Mar. 16, 2012) (quotation omitted)

8

(ellipsis in original). The court determines "the plainness or ambiguity of statutory language . . . by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Id. (quotation omitted).

In discerning the meaning of "required," the court examines the definition of "required." As noted, the HPA does not define "required"; therefore, the court may examine the dictionary definition. See Fowler v. United States, 131 S. Ct. 2045, 2050–51 (2011); Rousey v. Jacoway, 544 U.S. 320, 326 (2005); AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 394 (1999). The dictionary defines "require" to mean "1 . . . to ask, request, or desire . . . [;] 2 . . . to ask for authoritatively or imperatively : claim by right and authority : insist upon usu[ally] with certainty or urgency : DEMAND, EXACT . . . [;] 3 . . . to demand as necessary or essential . . . [;] 5 . . . to impose a compulsion or command upon (as a person) to do something : demand of (one) that something be done or some action taken : enjoin, command, or authoritatively insist (that someone do something) . . . ." Webster's New Int'l Dictionary 1929 (3d ed. 1993). This definition makes clear that "require" means to demand as necessary or to authoritatively insist. "The context of this provision does not suggest that Congress deviated from the term's ordinary meaning." Rousey, 544 U.S. at 326. Because the statute uses the word "required" in the passive voice, however, the court must determine who "required" private mortgage insurance. Given that the HPA does not "require" private mortgage insurance in connection with a residential mortgage transaction, 12 U.S.C. § 4910(a), the only source of such a "requirement" in connection with a residential mortgage transaction would be from the prospective mortgagee itself.

Bank of America argues that the phrase "required in connection with a residential mortgage transaction," as used in section 4905(c), applies only when a prospective mortgagee required private mortgage insurance as a condition of closing the loan. See Def.'s Mem. Supp. Mot. Dism. 5

9

(emphasis removed). Bank of America then argues that it did not "require" private mortgage insurance as a condition of closing plaintiffs' loans. In support, Bank of America cites statements in plaintiffs' amended complaint about Bank of America's intent to self-insure the risk and charge customers nothing for the service with NFMP loans. Id. 7; see Am. Compl. ¶ 17; see also id. ¶¶ 24–25, 50–51. Bank of America also cites the covenants concerning mortgage insurance in the Augustson, Kiel, and Prosser Deeds of Trust, which state, "If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premium required to maintain the Mortgage Insurance in effect." Def.'s Mem. Supp. Mot. Dism. 6 (citing Am. Compl. Exs. E, L & Def.'s Mem. Supp. Mot. Dism. Ex. 2). Bank of America then notes that plaintiffs did not pay any premiums for private mortgage insurance; therefore, such insurance was not "required." Furthermore, Bank of America argues that plaintiffs are improperly seeking to substitute the word "present" for the word "required," and thereby expand the HPA beyond its statutory scope.

Plaintiffs respond that they have plausibly alleged that Bank of America "required" private mortgage insurance in connection with their NFMP loans. In support, plaintiffs contend that their loan-to-value ratios were higher than 80 percent and that Bank of America "required" private mortgage insurance on such loans. See Pls.' Mem. Opp'n Mot. Dism. 13 n.2 (citing Am. Compl. ¶¶ 12, 23, 47, 70).

The court agrees that the word "required" in section 4905(c) does not mean "present." Nonetheless, plaintiffs have plausibly alleged that Bank of America "required" private mortgage insurance "in connection with" their "residential mortgage transaction[s]." See 12 U.S.C. § 4905(c). Whether, in fact, Bank of America actually "required" such lender-paid private mortgage insurance is an issue for a later day. Likewise, when Bank of America purchased the private mortgage insurance, how it paid for such private mortgage insurance, and whether the purchase or decision to

10

purchase was before "the date on which [the] loan commitment [was] made" are issues for another day. Id. § 4905(c)(1); cf. id. § 4905(a)(3). Accordingly, Bank of America's motion to dismiss count one is denied.

B.

Citing Bank of America's statements that the NFMP mortgage loans did not include private mortgage insurance due to the Bank's vast reserves, plaintiffs claim that Bank of America committed fraud or negligent misrepresentation under North Carolina law. Am. Compl. ¶¶ 111–25. A plaintiff may establish a prima facie case for fraud under North Carolina law by pleading facts showing

> (a) that the defendant made a representation relating to some material past or existing fact; (b) that the representation was false; (c) that when he made it [the] defendant knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (d) that the defendant made the false representation with the intention that it should be acted on by the plaintiff; (e) that the plaintiff reasonably relied upon the representation and acted upon it; and (f) that the plaintiff suffered injury.

Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 323 N.C. 559, 568, 374 S.E.2d 385, 391 (1988) (emphasis and quotation omitted); see also Sunset Beach Dev., LLC v. AMEC, Inc., 196 N.C. App. 202, 208, 675 S.E.2d 46, 52 (2009). A plaintiff may establish fraudulent intent through circumstantial evidence. See Sunset Beach, 196 N.C. App. at 209, 675 S.E.2d at 52; Bolick v. Townsend Co., 94 N.C. App. 650, 652, 381 S.E.2d 175, 176 (1989). Generally, "a mere promissory representation will not support an action for fraud." Braun v. Glade Valley Sch., Inc., 77 N.C. App. 83, 87, 334 S.E.2d 404, 407 (1985); see Johnson v. Phoenix Mut. Life Ins. Co., 300 N.C. 247, 255, 266 S.E.2d 610, 616 (1980), overruled on other grounds by Myers & Chapman, 323 N.C. at 569, 374 S.E.2d at 392. However, "[a] promissory misrepresentation may constitute actionable fraud when it is made with intent to deceive the promisee, and the promisor, at the time of making it, has no intent to comply." Johnson, 300 N.C. at 255, 266 S.E.2d at 616; see Vincent v. Corbett, 244 N.C.

11

469, 470, 94 S.E.2d 329, 331 (1956).

"The tort of negligent misrepresentation occurs when in the course of a business or other transaction in which an individual has a pecuniary interest, he or she supplies false information for the guidance of others in a business transaction, without exercising reasonable care in obtaining or communicating the information." Schlieper v. Johnson, 195 N.C. App. 257, 262–63, 672 S.E.2d 548, 552 (2009) (quotation omitted); see also Fulton v. Vickery, 73 N.C. App. 382, 388, 326 S.E.2d 354, 358 (1985). A negligent misrepresentation claim presents a "highly fact-dependent" inquiry, "with the question of whether a duty is owed [to] a particular plaintiff being of paramount importance." Bob Timberlake Collection, Inc. v. Edwards, 176 N.C. App. 33, 40, 626 S.E.2d 315, 322 (2006) (quotations omitted); see also Short v. Turner, No. COA09-618, 2010 WL 697341, at *5 (N.C. Ct. App. Mar. 2, 2010) (unpublished table decision).

Here, plaintiffs allege that Bank of America committed fraud and negligent misrepresentation by making false statements to plaintiffs regarding whether Bank of America intended to burden their loans with lender-paid private mortgage insurance. See Am. Compl. ¶¶ 111–25. In support of their fraud claim, plaintiffs restate the various instances in which Bank of America informed plaintiffs that their loans would not be subject to private mortgage insurance. Id. ¶ 112. Plaintiffs contend that "[w]hether the loans . . . would be encumbered by private mortgage insurance is a material fact." Id. ¶ 113. Plaintiffs allege that, when making these statements, Bank of America knew of their falsity, and that Bank of America made the false statements intending to deceive plaintiffs. Id. ¶¶ 115–16. Plaintiffs claim that Bank of America's misrepresentations concerning private mortgage insurance "were reasonably calculated to deceive consumers so that they would be enticed into accepting . . . NFMP loan offers." Id. ¶ 114. The court assumes that plaintiffs intend to establish Bank of America's fraudulent intent through circumstantial evidence. Finally, plaintiffs state that

12

they reasonably relied on the misrepresentations and that their reliance caused injuries, specifically plaintiffs' ineligibility for the HARP program and plaintiffs' "subsidizing [Bank of America's] purported waiver of fees and costs . . . ." Id. ¶¶ 117–18.

Alternatively, plaintiffs claim negligent misrepresentation. Id. ¶¶ 120–25. In support, they state that Bank of America "failed to exercise that standard of care and competence in obtaining and communicating the information [regarding private mortgage insurance] to the [p]laintiffs . . . in the course of their dealing with [Bank of America] that [plaintiffs] were justified in expecting." Id. ¶ 122.

Initially, Bank of America argues that the HPA preempts plaintiffs' state-law fraud and negligent misrepresentation claims. Def.'s Mem. Supp. Mot. Dism. 8–11; see 12 U.S.C. § 4908(a)(1). Preemption is based on Congress's power to "take unto itself all regulatory authority over [a given topic]." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947); see M'Culloch v. Maryland, 17 U.S. 316, 405–06 (1819). The doctrine stems from the Supremacy Clause, U.S. Const., art. VI, cl. 2, and requires that a state provision that conflicts with a federal statute be "without effect" when Congress enacts the federal provision intending to displace state law. Maryland v. Louisiana, 451 U.S. 725, 746–47 (1981). However, a court must begin "with the basic assumption that Congress did not intend to displace state law." Id.; see Rice, 331 U.S. at 230. Evidence of congressional intent may overcome this basic assumption. Maryland, 451 U.S. at 746. Analyzing a statute's preemptive effect "is essentially a two-step process of first ascertaining the construction of the [federal statute and the state statute or law that the federal statute is claimed to preempt] and then determining the constitutional question whether they are in conflict." Perez v. Campbell, 402 U.S. 637, 644 (1971); see Chi. & Nw. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317–18 (1981).

Preemption may be express or implied. Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 152–53 (1982) ("[Preemption] is compelled whether Congress'[s] command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." (quotation omitted)); see also Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977); Cox v. Shalala, 112 F.3d 151, 154 (4th Cir. 1997). Congress expressly preempts state law "by directly stating its intention to do so." Cox, 112 F.3d at 154. Even when Congress includes an express preemption clause in a statute, a court still must carefully construe Congress's intended breadth of the preemption clause. See, e.g., Altria Grp., Inc. v. Good, 555 U.S. 70, 77 (2008). When a preemption clause "is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." Id. (quotation omitted).

The HPA contains an express preemption clause. See 12 U.S.C. § 4908(a)(1). It states,

> With respect to any residential mortgage or residential mortgage transaction consummated after the effective date of this chapter, and except as provided in paragraph (2), the provisions of this chapter shall supersede **any** provisions of the law of any State **relating to requirements for obtaining or maintaining private mortgage insurance in connection with residential mortgage transactions,** cancellation or automatic termination of such private mortgage insurance, **any disclosure of information addressed by this chapter, and any other matter specifically addressed by this chapter**.

Id. (emphases added). Paragraph (2) of the provision describes "protected State law[s]" that the HPA does not preempt. Id. § 4908(a)(2).[5]

_____

[5] Section 4908(a)(2) provides,

(2) Protection of existing State laws

    (A) In general

        The provisions of this chapter do not supersede protected State laws, except to the extent that the protected State laws are inconsistent with any provision of this chapter, and then only to the extent of the inconsistency.

14

Under plaintiffs' theory of the case in count one, Bank of America "required" lender-paid mortgage insurance "in connection with [plaintiffs'] residential mortgage transaction[s] . . . ." Id. § 4905(c). Thus, according to plaintiffs, the notice requirement in section 4905(c)(1) required Bank of America to notify them about what lender-paid mortgage insurance is and to advise them that such insurance is required in connection with their residential mortgage transactions. See id. § 4905(c)(1). Furthermore, according to plaintiffs, Bank of America's failure to provide such notice and

---

(B) Inconsistencies

> A protected State law shall not be considered to be inconsistent with a provision of this chapter if the protected State law—

>> (i) requires termination of private mortgage insurance or other mortgage guaranty insurance—

>>> (I) at a date earlier than as provided in this chapter; or

>>> (II) when a mortgage principal balance is achieved that is higher than as provided in this chapter; or

>> (ii) requires disclosure of information—

>>> (I) that provides more information than the information required by this chapter; or

>>> (II) more often or at a date earlier than is required by this chapter.

(C) Protected State laws

> For purposes of this paragraph, the term "protected State law" means a State law—

>> (i) regarding any requirements relating to private mortgage insurance in connection with residential mortgage transactions;

>> (ii) that was enacted not later than 2 years after July 29, 1998; and

>> (iii) that is the law of a State that had in effect, on or before January 2, 1998, any State law described in clause (i).

12 U.S.C. § 4908(a)(2).

affirmative misrepresentation about the lender-paid private mortgage insurance violated section 4905(c)(1). In counts two, three, and four, plaintiffs then rely on North Carolina common law to assert a fraud claim (count two), a negligent misrepresentation claim (count three), and an unjust enrichment claim (count four).

The crux of the claims in counts two and three "relat[e] to . . . disclosure of information addressed by [the HPA] . . . ." Id. § 4908(a)(1). After all, plaintiffs allege that Bank of America fraudulently or negligently misled them into believing that there was no lender-paid private mortgage insurance on their loans. As for whether a common law claim under North Carolina law of fraud or negligent misrepresentation falls within the meaning of "any provisions of the law of any State" in section 4908(a)(1), the term "'any' is a term of great breadth." United States v. Wildes, 120 F.3d 468, 470 (4th Cir. 1997). As such, counts two and three appear to fall within the heart of the preemption provision in section 4908(a)(1).

In support of this conclusion, Bank of America cites Fellows v. CitiMortgage, Inc., 710 F. Supp. 2d 385 (S.D.N.Y. 2010). In Fellows, the Southern District of New York held that the HPA preempted a New York Deceptive Trade Practices Act ("DTPA") claim. The court held that "[t]he HPA's use of the words 'relating to' in its preemption provision is key," because "Congress's use of the phrase 'relating to' in federal legislation generally signals its expansive intent." Id. at 399 (quotation omitted). In light of the broad language, the similarity of the language to other preemption clauses that courts had broadly construed, see Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1144(a); Airline Deregulation Act of 1978 ("ADA"), 49 U.S.C. § 41713(b)(1), and evidence that Congress intended to enact a robust preemption clause, see S. Rep. No. 105-129, at 8–9 (1997), the court held that the HPA preempted the DTPA claim. Fellows, 710 F. Supp. 2d at 399–403. The court reasoned that Congress had "intended for the HPA to remove

from the states' purview the regulation of requirements concerning [private mortgage insurance] cancellation and disclosure," and that "[plaintiff's] DTPA claim would interfere significantly with this objective." Id. at 402. The court rejected plaintiff's argument that the general applicability of the DTPA and its lack of specific reference to private mortgage insurance saved plaintiff's claim from preemption. Id. at 403.

In contrast to Fellows, plaintiffs cite Scott v. GMAC Mortgage, LLC, No. 3:10cv00024, 2010 WL 3340518 (W.D. Va. Aug. 25, 2010). In Scott, the United States District Court for the Western District of Virginia agreed with the Fellows court that the language of the HPA indicated Congress's broad preemptive intent. Id. at *4–5. In Scott, however, the court held that the HPA's broad preemption provision did not preempt plaintiff's state-law fraud claims, even though the fraud claim "related to . . . disclosure of information addressed by" the HPA, 12 U.S.C. § 4908(a)(1). See Scott, 2010 WL 3340518, at *5. Without focusing on the text of section 4908(a), the Scott court reasoned that the fraud claim did "not threaten the structural integrity" of the HPA's "uniform set of regulations [governing] the disclosure of mortgage insurance." Id.

In light of the limited authority on the scope of the HPA's preemption clause, the court looks to judicial construction of similar preemption clauses to determine whether the HPA preempts plaintiffs' claims. See Rowe v. N.H. Motor Transp. Ass'n, 552 U.S. 364, 370 (2008) ("[W]hen judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well." (quotation omitted)). The language of the HPA's preemption provision is similar to the language of the ERISA preemption provision. Compare 12 U.S.C. § 4908(a)(1), with

17

29 U.S.C. § 1144(a).[6] Congress used the word "any" in reference to state laws, and the words "relating to," 12 U.S.C. § 4908(a)(1), or "relate to," 29 U.S.C. § 1144(a), in defining the preemptive scope of each statute. Because of this similarity, consideration of the scope of ERISA's preemption clause is instructive in determining the scope of the HPA's preemption clause. See Rowe, 552 U.S. at 370; Scott, 2010 WL 3340518, at *4–5; Fellows, 710 F. Supp. 2d at 399–401.

"A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96–97 (1983); Great-W. Life & Annuity Ins. Co. v. Info. Sys. & Networks Corp., 523 F.3d 266, 270 (4th Cir. 2008). Therefore, ERISA preempts state laws "not specifically designed to affect such plans"; state laws that indirectly affect such plans; and state laws that are "consistent with ERISA's substantive requirements." Dist. of Columbia v. Greater Wash. Bd. of Trade, 506 U.S. 125, 129–30 (1992) (citation and quotations omitted); see Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 139 (1990); Metro. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 739 (1985). There is, however, a cognizable limit to the scope of section 1144(a). See N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655 (1995) ("If 'relate to' were taken to extend to the furthest stretch of its indeterminancy, then . . . pre-emption would never run its course . . . [and] that . . . would . . . read Congress's words of limitation as [a] mere sham, and . . . read the presumption against pre-emption out of the law . . . ."). Therefore, a court should "go beyond the unhelpful text . . . and look instead to the objectives of the ERISA statute as a guide to the scope of

---

[6] Section 1144(a) states,

Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede **any** and all State laws insofar as they may now or hereafter **relate to** any employee benefit plan . . . .

29 U.S.C. § 1144(a) (emphasis added).

18

the state law that Congress understood would survive" when determining whether section 1144(a) overcomes the normal presumption against preemption. Id. at 656; see also De Buono v. NYSA-ILA Med. & Clinical Servs. Fund, 520 U.S. 806, 813–14 (1997). Moreover, ERISA does not preempt state law when the effect the state law has on covered plans is "too tenuous, remote, or peripheral . . . to warrant a finding that the law 'relates to' the plan." Shaw, 463 U.S. at 100 n.21.

"[I]n light of the objectives of ERISA and its preemption clause, Congress intended ERISA to preempt at least three categories of state laws that can be said to have a connection with an ERISA plan." Coyne & Delany Co. v. Selman, 98 F.3d 1457, 1468 (4th Cir. 1996). These categories are (1) "state laws that mandate employee benefit structures or their administration"; (2) "state laws that bind employers or plan administrators to particular choices or preclude uniform administrative practice"; and (3) state laws that provide "alternate enforcement mechanisms for employees to obtain ERISA plan benefits." Id. (quotations and alteration omitted). A state-law claim provides "an alternate enforcement mechanism" for obtaining benefits when it rests on the same allegations that support an ERISA claim and is brought by an employee against a defendant owing a plan-created fiduciary duty to the employee. See Wilmington Shipping Co. v. New Eng. Life Ins. Co., 496 F.3d 326, 341–44 (4th Cir. 2007) ("Nor may parties avoid ERISA's preemptive reach by recasting otherwise preempted claims as state-law contract and tort claims."); see also Aetna Health Inc. v. Davila, 542 U.S. 200, 212–14 (2004) (holding that state-law claims are preempted when the terms of benefit plans form an essential part of the state-law claim and liability under state law would not exist absent a plaintiff's participation in an ERISA-covered plan). Additionally, a state-law claim triggers ERISA preemption when allowing the claim to proceed would have "an effect on the primary administrative functions of benefit plans, such as determining an employee's eligibility for a benefit and the amount of that benefit." Gresham v. Lumbermen's Mut. Cas. Co., 404 F.3d 253,

258 (4th Cir. 2005) (quotation omitted). ERISA does not, however, preempt generally applicable state-law claims that do not implicate relations between the traditional principals of an ERISA plan (the employer, the plan, the plan fiduciaries, and the plan beneficiaries). Selman, 98 F.3d at 1469; see Custer v. Sweeney, 89 F.3d 1156, 1167 (4th Cir. 1996) (holding that ERISA does not preempt state-law legal malpractice actions against attorneys representing ERISA plans).

Based on these principles, the Fourth Circuit has held that "[g]enerally speaking, ERISA preempts state common law claims of fraudulent or negligent misrepresentation when the false representations concern the existence or extent of benefits under an employee benefit plan." Griggs v. E.I. DuPont de Nemours & Co., 237 F.3d 371, 378 (4th Cir. 2001). In Griggs, the court held that when the claim "is premised on the existence of an employee benefit plan so that in order to prevail, a plaintiff must plead, and the court must find, that an ERISA plan exists, ERISA preemption will apply." Id. (citation and quotations omitted); see Ingersoll-Rand, 498 U.S. at 140; see also Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 52–55 (1987) (holding that because of its "comprehensive civil enforcement scheme," ERISA preempted plaintiff's state-law fraud claim), abrogated in part on other grounds by Ky. Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329 (2003); cf. LeBlanc v. Cahill, 153 F.3d 134, 147–48 (4th Cir. 1998) (holding that ERISA did not preempt a state-law fraud claim brought by plan trustees against a third party who allegedly induced the trustees to invest plan funds in a fraudulent investment scheme, because the generally applicable common law action did not implicate relations among the ERISA plan principals).

Plaintiffs argue that section 4908(a) does not preempt their fraud and negligent misrepresentation claims because these claims pertain to actions that occurred before the creation of their HPA-governed mortgages. See Pls.' Mem. Opp'n Mot. Dism. 15–19. The Fourth Circuit has suggested that ERISA may not preempt some state-created tort claims when the conduct

underlying the claims occurred before the creation of an ERISA-covered plan. For example, in Selman, the court held that ERISA did not preempt a Virginia legal malpractice claim in part because "[d]efendants' malpractice, if any, occurred before the faulty plan went into effect[,] . . . [making it] irrelevant that [plaintiff] ultimately hired the defendants to serve as Plan Administrator and Plan Supervisor . . . ." Selman, 98 F.3d at 1471. Therefore, ERISA did not preempt the legal malpractice claim because the claim "did not involve an existing ERISA plan." Id. at 1472.

Courts have not extended Selman to permit state-created fraud and misrepresentation claims arising from the inducement to purchase an employee benefit plan. See, e.g., Korman v. MAMSI Life & Health Ins. Co., 121 F. Supp. 2d 843, 847–48 (D. Md. 2000) (declining to extend Selman to cover a claim of fraudulent inducement brought by an ERISA-covered plan beneficiary against an insurer, and holding that ERISA preempted the claim because consideration of it would entail close consideration of the plan). Furthermore, extending Selman to this context would conflict with earlier Fourth Circuit authority. See Elmore v. Cone Mills Corp., 23 F.3d 855, 863 (4th Cir. 1994) (en banc) (holding that ERISA preempted plaintiff's fraud claim based on false statements made before an ERISA-covered plan came into existence because the fraud claim "clearly relate[d] to an ERISA-covered plan" (quotation omitted)); see also Griggs, 237 F.3d at 378; accord Otero Carrasquillo v. Pharmacia Corp., 466 F.3d 13, 20 (1st Cir. 2006); Trs. of AFTRA Health Fund v. Biondi, 303 F.3d 765, 780 (7th Cir. 2002); Hall v. Blue Cross/Blue Shield of Ala., 134 F.3d 1063, 1065–66 (11th Cir. 1998); Smith v. Tex. Children's Hosp., 84 F.3d 152, 155–56 (5th Cir. 1996); Hubbard v. Blue Cross & Blue Shield Ass'n, 42 F.3d 942, 946–47 (5th Cir. 1995); cf. Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 991–92 (10th Cir. 1999); Wilson v. Zoellner, 114 F.3d 713, 717 (8th Cir. 1997).

Based on these cases interpreting ERISA's robust preemption provision, and Congress's use of similarly broad language in the HPA's preemption provision, the court concludes that the HPA's preemptive scope is analogous to ERISA's. Thus, the court turns to the allegations in the amended complaint to determine whether the HPA preempts plaintiffs' fraud and negligent misrepresentation claims.

In plaintiffs' fraud and negligent misrepresentation claims, plaintiffs seek to use North Carolina common law to pursue two tort claims "relating to . . . disclosure of information addressed by [the HPA] . . . ." 12 U.S.C. § 4908(a)(1). Specifically, plaintiffs ground their fraud and negligent misrepresentation claims in Bank of America's alleged misrepresentations and omissions regarding the purchase of lender-paid private mortgage insurance in connection with plaintiffs' residential mortgage transactions. Moreover, the harm plaintiffs claim to have suffered results from Bank of America's misrepresentations and omissions relating to information about the private mortgage insurance that Bank of America purchased in connection with plaintiffs' loans and the allegedly higher-priced mortgage that each plaintiff received. Therefore, plaintiffs' fraud and negligent misrepresentation claims "relat[e] to" the "disclosure of information addressed by [the HPA] . . . ." Id. Moreover, these common law tort claims are "provisions of the law of any State" within the meaning of section 4908(a)(1).

"State law claims sounding in tort but which are based on the allegedly wrongful denial . . . of benefits under [a federally regulated program or plan subject to broad preemption] are preempted." Ford v. Hartford Life & Accident Ins. Co., No. 3:08CV281, 2009 WL 963594, at *5 (W.D.N.C. Apr. 8, 2009); see Griggs, 237 F.3d at 378; Stiltner v. Beretta U.S.A. Corp., 74 F.3d 1473, 1480–81 (4th Cir. 1996) (en banc); Fellows, 710 F. Supp. 2d at 402–03. Notably, plaintiffs' fraud and negligent misrepresentation claims depend on the existence of HPA-covered mortgages,

22

and the court would have to review their mortgages and disclosures relating to private mortgage insurance to evaluate their claims. See Griggs, 237 F.3d at 378–79; Fellows, 710 F. Supp. 2d at 399–403. Additionally, plaintiffs do not differentiate between the actual damages they seek for Bank of America's alleged fraud and negligent misrepresentation, and the actual damages they seek for Bank of America's alleged violation of the HPA. See Am. Compl. ¶¶ 110, 119, 124. In the HPA, Congress provided for the recovery of actual damages and statutory damages, see 12 U.S.C. § 4907(a), and included an express preemption clause. See id. § 4908(a)(1). The HPA's preemption clause preempts "any" state law "relating to . . . any disclosure of information addressed by this chapter, and any other matter specifically addressed by this chapter." Id. Plaintiffs' fraud and negligent misrepresentation claims fall within the heart of this preemption clause. Thus, plaintiffs' fraud and negligent misrepresentation claims are preempted and are dismissed. In light of this conclusion, the court need not address Bank of America's alternative arguments about alleged deficiencies in plaintiffs' fraud claim.

Alternatively, plaintiffs' negligent misrepresentation claim fails because plaintiffs do not plausibly allege negligence. The amended complaint is replete with allegations that Bank of America acted intentionally. See Am. Compl. ¶¶ 26–27, 50–51, 79. As such, the negligent misrepresentation claim fails. See, e.g., Thompson v. Bank of Am., No. 7:09-CV-89-H, 2011 WL 1253163, at *2 (E.D.N.C. Mar. 30, 2011); Guyton v. FM Lending Servs., Inc., 199 N.C. App. 30, 48–49, 681 S.E.2d 465, 479 (2009); Bratcher v. Pharm. Prod. Dev., Inc., 545 F. Supp. 2d 533, 545–46 (E.D.N.C. 2008) (collecting cases).

C.

Plaintiffs also allege unjust enrichment. Am. Compl. ¶¶ 126–29. Under North Carolina law, unjust enrichment is an equitable doctrine that allows for "the return of, or payment for, benefits

23

received under circumstances where it would be unfair for the recipient to retain them without the contributor being repaid or compensated." Rhue v. Rhue, 189 N.C. App. 299, 303–04, 658 S.E.2d 52, 57 (2008) (quotation omitted); see also Collins v. Davis, 68 N.C. App. 588, 591, 315 S.E.2d 759, 761, aff'd, 312 N.C. 324, 321 S.E.2d 892 (1984) (per curiam). A claim of unjust enrichment requires a plaintiff to show that "it conferred a benefit on another party, that the other party consciously accepted the benefit, and that the benefit was not conferred gratuitously or by an interference in the affairs of the other party." Se. Shelter Corp. v. BTU, Inc., 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002); see also Booe v. Shadrick, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988). "No contract, oral or written, enforceable or not, is necessary to support a recovery based upon unjust enrichment." Rhue, 189 N.C. App. at 304, 658 S.E.2d at 57 (quotation omitted); see also Parslow v. Parslow, 47 N.C. App. 84, 88–89, 266 S.E.2d 746, 749 (1980), abrogated on other grounds by Wright v. Wright, 305 N.C. 345, 289 S.E.2d 347 (1982).

Plaintiffs claim that Bank of America was unjustly enriched in two ways. First, Bank of America charged plaintiffs "higher interest rates . . . than [it] charged to other . . . customers," who did not obtain NFMP loans. Am. Compl. ¶ 127. Second, Bank of America's purchase of private mortgage insurance prevented plaintiffs from refinancing their mortgages, enabling Bank of America to continue to benefit from these higher interest rates when plaintiffs would have otherwise been able to pay lower interest rates after refinancing. Id. ¶ 128.

Plaintiffs' unjust enrichment claim fails for at least three reasons. First, for the same reasons that the fraud and negligent misrepresentation claims are preempted, the unjust enrichment claim is preempted under section 4908(a)(1). See 12 U.S.C. § 4908(a)(1).

Second, even if not preempted, "[o]nly in the absence of an express agreement of the parties will courts impose a quasi contract or a contract implied in law in order to prevent an unjust

24

enrichment." Whitfield v. Gilchrist, 348 N.C. 39, 42, 497 S.E.2d 412, 415 (1998). Here, each plaintiff had an express contract with Bank of America. See Am. Compl. ¶¶ 29–30, 52–53, 73. Accordingly, under North Carolina law, plaintiffs cannot recover under a theory of unjust enrichment. See, e.g., PCS Phosphate Co., Inc. v. Norfolk S. Corp., 520 F. Supp. 2d 705, 718 (E.D.N.C. 2007), aff'd, 559 F.3d 212 (4th Cir. 2009); Ron Medlin Constr. v. Harris, 364 N.C. 577, 580, 704 S.E.2d 486, 489 (2010); Whitfield, 348 N.C. at 42, 497 S.E.2d at 415; Waters Edge Builders, LLC v. Longa, 715 S.E.2d 193, 196 (N.C. Ct. App. 2011); Pritchett & Burch, PLLC v. Boyd, 169 N.C. App. 118, 124, 609 S.E.2d 439, 443 (2005).

Third, under North Carolina law, a benefit is "unjust" when the benefit was conferred "under circumstances which give rise to a legal or equitable obligation on the part of the defendant to account for the benefits received . . . ." Norman v. Nash Johnson & Sons' Farms, Inc., 140 N.C. App. 390, 417, 537 S.E.2d 248, 266 (2000). Plaintiffs' amended complaint does not plausibly allege circumstances creating a legal or equitable obligation for Bank of America to account for a benefit. The crux of plaintiffs' claim is that Bank of America told plaintiffs that it would not purchase lender-paid private mortgage insurance, but did so anyway. However, plaintiffs received the loan at the interest rate that each agreed to pay. Simply put, plaintiffs do not plausibly allege that each plaintiff is paying a higher interest rate due to lender-paid private mortgage insurance or plausibly explain why it is "unjust" for each contracting party to receive the benefit of the bargain in the contract.

Plaintiffs have failed to state a claim for unjust enrichment. Therefore, the court grants Bank of America's motion to dismiss this claim.

D.

Finally, plaintiffs ask this court to issue an injunction "requiring [Bank of America] to cancel any [lender-paid mortgage insurance] that it has placed on the properties of [plaintiffs] and the

25

Class." Am. Compl. ¶ 133. An injunction is a remedy rather than a stand-alone cause of action, and the court would consider the merits of awarding injunctive relief only if plaintiffs established Bank of America's liability under the HPA. See Laws v. Priority Tr. Servs. of N.C., L.L.C., 610 F. Supp. 2d 528, 532 (W.D.N.C. 2009), aff'd, 375 F. App'x 345 (4th Cir. 2010) (unpublished); see also Raniszewski v. Davidson, No. 3:11CV59, 2011 WL 4914969, at *6 (W.D.N.C. Oct. 17, 2011).

Until liability is established, the court need not address whether the requested injunctive relief is an appropriate remedy under the HPA as to plaintiffs Augustson and Prosser. As for the Kiels, they refinanced their mortgage. See Am. Compl. ¶ 65. As part of the refinancing, the lender-paid mortgage insurance was canceled. Thus, the request for injunctive relief as to the Kiels is dismissed as moot.

### III.

Accordingly, the court GRANTS in part and DENIES in part defendant's motion to dismiss plaintiffs' amended complaint [D.E. 23]. Count one may proceed. Counts two, three, and four are DISMISSED for failure to state a claim upon which relief can be granted. Plaintiff Kiels' request for injunctive relief is DISMISSED AS MOOT. The court declines to address the viability of the requested equitable relief on count one unless and until plaintiffs prove liability on count one.

SO ORDERED. This **29** day of March 2012.

JAMES C. DEVER III
Chief United States District Judge

26